United States District Court
Southern District of Texas

**ENTERED**

February 01, 2022

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY DEREK WHITEHEAD, | § | |
| TDCJ #2289205, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-20-3869 |
| MELODY CURBO and LATINA | § | |
| BLAIR, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Timothy Derek Whitehead (TDCJ #2289205), has filed a Prisoner's Civil Rights Complaint ("Complaint") (Docket Entry No. 1), alleging that he was denied adequate medical care by a nurse and a physician's assistant while incarcerated in the Texas Department of Criminal Justice ("TDCJ"). At the court's request he has filed Plaintiff's More Definite Statement ("Plaintiff's MDS") (Docket Entry No. 8), which provides additional details about his claims. Now pending before the court is Defendants [LaTina] Blair and [Melody] Curbo's Motion for Summary Judgment ("Defendants' MSJ") (Docket Entry No. 27). Whitehead has not filed a response, but he has submitted several exhibits pursuant to the disclosure of discovery provisions found in Fed. R. Civ. P. 26 (Docket Entry No. 29). After considering all of the pleadings, the exhibits, and the applicable law, the Defendants' MSJ will be granted and this case will be dismissed for the reasons explained below.

## I.   **Background**

Whitehead alleges that he was denied adequate medical care by a nurse and a physician's assistant during the intake process that took place during a four-week period in November 2019, following his arrival at the Holliday Unit in Huntsville.[1]   Public records reflect that Whitehead was sentenced to five years' imprisonment on October 17, 2019, in Grimes County, Texas, following a conviction for fraudulent use of identification in Case No. 18469.[2]   Shortly after that conviction was entered, Whitehead was admitted to TDCJ on November 5, 2019.[3]

Whitehead alleges that when he first arrived at the Holliday Unit on November 5, 2019, he reported having an infection in his left eye that he first noticed on November 1, 2019, while he was still in custody at the Grimes County Jail.[4]   While at the Jail, Whitehead saw an ophthalmologist who prescribed ointment and eye

---

[1]Complaint, Docket Entry No. 1, pp. 3-4;  Plaintiff's MDS, Docket Entry No. 8, pp. 2, 5. For purposes of identification, all page numbers reference the pagination imprinted by the court's electronic case filing ("ECF") system.

[2]See Texas Department of Criminal Justice Offender Information, available at: https://inmate.tdcj.texas.gov (last visited January 26, 2022).  These records reflect that Whitehead has numerous prior convictions and that he is also serving a two-year prison sentence that he received in February 2020, for possession of a controlled substance (methamphetamine) in Harris County Case No. 1594811.  See id.

[3]Plaintiff's MDS, Docket Entry No. 8, p. 2.

[4]Id. at 5, 7.

-2-

drops.[5] According to Whitehead, health care providers who conducted his initial "medical intake" at the Holliday Unit on November 5, 2019, put him on antibiotics.[6]

Two days later, on November 7, 2019, Whitehead claims that he had a fever, that he was in "severe pain," and that his left eye was "leaking blood and puss."[7] Medical records provided by the defendants show that Whitehead had an ocular implant with a prosthesis in his left eye, which he lost following an "accident with a pressure washer" in January of 2018.[8] According to information provided by the defendants, orbital implants following the loss of an eye have a risk of complications such as infection.[9] Whitehead claims that he requested immediate care for his left eye from "an optha[l]mologist or a trauma surgeon," but that Melody Curbo, a licensed vocational nurse employed at the Holliday Unit, denied that request.[10]

Whitehead alleges that he was also denied care for his infected left eye by LaTina Blair, a physician's assistant at the

_____

[5] Id. at 7.

[6] Id.

[7] Id. at 6.

[8] Correctional Managed Health Care Ocular Prosthesis Record dated Jan. 13, 2021, Docket Entry No. 24-14, p. 4.

[9] American Society of Ocularists, Surgical Procedures, Docket Entry No. 27-9, pp. 3-5.

[10] Plaintiff's MDS, Docket Entry No. 8, p. 6.

-3-

Holliday Unit, on two occasions.  On the first occasion, which reportedly happened "[o]n or about November 14, 2019," Whitehead claims that he asked to "see an optha[l]mologist, a surgeon, or [to be] taken to the emergency room."[11] By this time, Whitehead reports that he had "severe pain, bleeding, and infection" in his left eye as well as a fever that had lasted over a week.[12]  According to Whitehead, Blair told him to keep taking his antibiotics, but refused any further care.[13]

Whitehead alleges that he also saw Blair "[o]n or about November 19, 2019," and repeated his request to see an ophthalmologist, a surgeon, or to go to the emergency room.[14]  He claims that he had a high fever and that his implant was "bulging" or protruding from the eye socket, which he describes as swollen.[15] Whitehead contends that Blair denied his request for care, noting that he was on antibiotics and that he had a ophthalmology appointment scheduled in December.[16]

On November 26, 2019, Whitehead was seen in the clinic at the Holliday Unit and then taken to the local hospital in Huntsville,

---

[11]Plaintiff's MDS, Docket Entry No. 8, p. 10.

[12]Id.

[13]Id. at 11.

[14]Id. at 12.

[15]Id. at 12-13.

[16]Id. at 12.

which sent him to the emergency room at a hospital located in Conroe.[17]  Whitehead was diagnosed with cellulitis and transferred to Memorial Hermann Hospital ("Memorial Hermann") in Houston, where he had surgery to remove his ocular implant, which required a skin graft from his abdominal area so that his eyelid could be stitched shut.[18]

Whitehead blames Curbo and Blair for the loss of his ocular implant, alleging that they denied him adequate care in violation of his rights under the Eighth Amendment.[19]  He seeks compensatory damages for his pain and disfigurement.[20]

Curbo and Blair move for summary judgment, asserting that they are entitled to sovereign immunity under the Eleventh Amendment from the claims against them in their official capacity.[21]  Pointing to medical records that refute Whitehead's claims, Curbo and Blair argue further that they are entitled to qualified immunity from the claims against them in their personal capacity because Whitehead fails to establish that they denied him care in violation of the

_____

[17]Id. at 14-15.  Whitehead alleges that this occurred on November 25, 2019, but medical records confirm that he was treated in the Holliday Unit clinic and then transported to the local hospital on November 26, 2019.  See Correctional Managed Health Care ("CMHC") Urgent/Emergent Care Record dated Nov. 26, 2019, Docket Entry No. 27-8, p. 3.

[18]Plaintiff's MDS, Docket Entry No. 8, pp. 5, 16.

[19]Complaint, Docket Entry No. 1, pp. 3-4, 7.

[20]Id. at 4.

[21]Defendants' MSJ, Docket Entry No. 27, pp. 9-10.

Eighth Amendment.[22]  In support, the defendants provide an affidavit
from Dr. Glenda M. Adams ("Dr. Adams"), and as well as medical
records of treatment provided at the Grimes County Jail, TDCJ,
Memorial Hermann, and the University of Texas Medical Branch
("UTMB") Hospital in Galveston, which provides care for state
inmates.[23]  The defendants' arguments are examined below under the
applicable standard of review.

## II.   **Standard of Review**

Motions for summary judgment are governed by Rule 56 of the
Federal Rules of Civil Procedure.   Under this rule a reviewing
court "shall grant summary judgment if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)
(2021); see also Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552
(1986).   A fact is "material" if its resolution in favor of one
party might affect the outcome of the suit under governing law.
Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).   An
issue is "genuine" if the evidence is sufficient for a reasonable
jury to return a verdict for the nonmoving party.   Id.

In deciding a summary judgment motion, the reviewing court
must view all facts and inferences in the light most favorable to

---

[22]Id. at 10-16.

[23]Affidavit of Dr. Glenda M. Adams, M.D., M.P.H. ("Dr. Adams's Affidavit"), Docket Entry No. 27-1, pp. 1-11; and Exhibits A-1 through A-13, Docket Entry Nos. 27-2 through 27-14.

the nonmovant and resolve all factual disputes in his favor.  See Shah v. VHS San Antonio Partners, L.L.C., 985 F.3d 450, 453 (5th Cir. 2021).  If the movant demonstrates an "absence of evidentiary support in the record for the nonmovant's case," the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial."  Sanchez v. Young County, Texas, 866 F.3d 274, 279 (5th Cir. 2017) (citing Cuadra v. Houston Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010)).  The nonmovant cannot avoid summary judgment by resting on his pleadings or presenting "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  Jones v. Lowndes County, Mississippi, 678 F.3d 344, 348 (5th Cir. 2012) (citation and internal quotation marks omitted); see also Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (a nonmovant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence).

The plaintiff represents himself in this case.  Courts are required to give a pro se litigant's contentions a liberal construction.  See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (per curiam) (citation omitted).  Nevertheless, a pro se litigant is not excused from meeting his burden of proof of specifically referring to evidence in the summary judgment record and setting forth facts showing that there is a genuine issue of material fact remaining for trial.  See Outley v. Luke & Associates, Inc., 840

-7-

F.3d 212, 217 (5th Cir. 2016); see also Bookman v. Shubzda, 945 F. Supp. 999, 1004 (N.D. Tex. 1996) (citing Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994) (citation omitted)).  The court has no obligation under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment." Adams v. Travelers Indemnity Co. of Connecticut, 465 F.3d 156, 164 (5th Cir. 2006) (quotation omitted).

In an Order entered on January 19, 2021, the court directed Whitehead to respond within thirty days to any motion for summary judgment submitted by the defendants.[24]  Whitehead was advised that under this court's Local Rule 7.4, any failure to respond to a motion filed by the defendants "will be taken as a representation of no opposition."[25]  The certificate of service for Defendants' MSJ reflects that it was provided to Whitehead at his address of record,[26] but he has not filed a response to the motion. Notwithstanding the plaintiff's failure to respond, summary judgment may not be awarded by default "simply because there is no opposition, even if the failure to oppose violated a local rule." Hibernia Nat'l Bank v. Administration Cent. Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir. 1985).  "However, a court may grant an unopposed summary judgment motion if the undisputed facts show that

---

[24]Order and Request for Answer, Docket Entry No. 9, p. 3 ¶ 5.

[25]Id. (quoting S.D. Tex. R. 7.4.).

[26]Defendants' MSJ, Docket Entry No. 27, p. 18.

-8-

the movant is entitled to judgment as a matter of law." Day v. Wells Fargo Bank Nat'l Ass'n, 768 F.3d 435, 435 (5th Cir. 2014) (citation omitted); see also Eversley v. MBank Dallas, 843 F.2d 172, 174 (5th Cir. 1988).

## III.  Discussion

### A.   Sovereign Immunity - Eleventh Amendment

The defendants, who are employed as health care providers by UTMB, contend that they are entitled to state sovereign immunity under the Eleventh Amendment from Whitehead's claims against them in their official capacity.[27] Unless expressly waived, the Eleventh Amendment bars an action in federal court by a citizen of a state against his or her own state, including a state agency. See Will v. Michigan Dep't of State Police, 109 S. Ct. 2304, 2309 (1989). The Eleventh Amendment also bars a federal action for monetary damages against state officials when the state itself is the real party in interest. See Pennhurst State School & Hospital v. Halderman, 104 S. Ct. 900, 908-09 (1984). A suit against a state official in his or her official capacity is considered a suit against the state itself. See Will, 109 S. Ct. at 2312 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." (internal citations omitted)).

_____

[27]Id. at 9-10.

-9-

Texas has not waived its Eleventh Amendment immunity and Congress did not abrogate that immunity when it enacted 42 U.S.C. § 1983. See NiGen Biotech, L.L.C. v. Paxton, 804 F.3d 389, 394 (5th Cir. 2015) (citing Quern v. Jordan, 99 S. Ct. 1139, 1145 (1979)). Because UTMB is a state agency, the defendants are entitled to immunity from any claim for monetary damages against them in their official capacity as state employees.[28] See Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2001). Therefore, the defendants are entitled to summary judgment on this issue.

**B.   Qualified Immunity**

The defendants have also asserted qualified immunity from liability for Whitehead's claim for monetary damages against them in their personal capacity, arguing that he has not shown that they violated his constitutional rights.[29] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S.

--------

[28]Whitehead has also named TDCJ as a defendant. See Complaint, Docket Entry No. 1, p. 3. The court did not request an answer from TDCJ because it is a state agency that is entitled to immunity under the Eleventh Amendment. See Loya v. Texas Department of Corrections, 878 F.2d 860, 861 (5th Cir. 1989) (per curiam) ("[TDCJ's] entitlement to immunity under the [E]leventh [A]mendment is clearly established in this circuit."). Accordingly, the claims against TDCJ are dismissed under 28 U.S.C. § 1915A(b).

[29]Defendants' MSJ, Docket Entry No. 27, pp. 11-16.

Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)).   "'[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) (quoting Anderson v. Creighton, 107 S. Ct. 3034, 3038 (1987) (citation omitted)).

"[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Ratliff v. Aransas County, Texas, 948 F.3d 281, 287 (5th Cir. 2020) (internal quotation marks and citation omitted).   Once the defense is invoked by a defendant, "the plaintiff must rebut it by establishing (1) that the [defendant] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" Rich v. Palko, 920 F.3d 288, 294 (5th Cir. 2019) (quoting District of Columbia v. Westby, 138 S. Ct. 577, 589 (2018) (citation omitted)).   A plaintiff seeking to meet this burden at the summary-judgment stage "may not rest on mere allegations or unsubstantiated assertions but must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." Mitchell v. Mills, 895 F.3d 365, 370 (5th Cir. 2018) (citations omitted).

Whitehead's claims concerning the conditions of his confinement are governed by the Eighth Amendment, which prohibits cruel and unusual punishment, i.e., the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 111 S. Ct. 2321, 2323 (1991) (citation omitted). Prison officials are required by the Eighth Amendment to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (internal quotation marks omitted). To establish a claim for the denial of adequate medical care, a prisoner must demonstrate that prison officials violated the Eighth Amendment by acting with "deliberate indifference to a prisoner's serious illness or injury[.]" Estelle v. Gamble, 97 S. Ct. 285, 291 (1976).

The deliberate indifference standard is an "extremely high" one to meet. Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 114 S. Ct. at 1979. A prison official acts with the requisite deliberate indifference "only if he knows that inmates face a substantial risk of serious

-12-

harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 1984.

A prisoner who alleges that he was denied medical care with deliberate indifference must demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (citation and internal quotation marks omitted). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." Id. (citations omitted). In addition, "[m]edical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference." Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995) (citing Mendoza v. Lynaugh, 989 F.2d 191, 193-95 (5th Cir. 1993)). Whitehead's claims against each defendant are examined separately below following a summary of the medical care he received.

## 1.  Summary of Whitehead's Medical Care

As noted above, Whitehead's left eye was removed and replaced with an ocular implant or prosthesis before he arrived at TDCJ in

-13-

November of 2019.[30]   Before he arrived at TDCJ, Whitehead was
treated by an ophthalmologist (Dr. Mark Lindsay) for inflammation
of the left eye socket while in custody at the Grimes County Jail
on October 9, 2019.[31]   Dr. Lindsay determined that no treatment was
needed, but that he would consult with a "prosthesis fitter" about
whether Whitehead needed to change his "cleaning routine" for his
ocular prosthesis.[32]   On October 31, 2019, Dr. Lindsay sent two
handouts with instructions on the care of an ocular prosthesis to
the Grimes County Jail for Whitehead to follow.[33]   The next day a
nurse gave Whitehead a lubricating ointment (Lacri-Lube) to
alleviate eye dryness.[34]

On November 5, 2019, Whitehead arrived at the TDCJ Holliday
Unit.[35]   During an initial screening examination, Whitehead noted

---

[30]Correctional Managed Health Care Ocular Prosthesis Record
dated Jan. 13, 2021, Docket Entry No. 24-14, p. 4.

[31]Grimes County Sheriff's Office, Medical Request/Report Form
dated Oct. 9, 2019, Docket Entry No. 27-4, p. 15.

[32]Id.

[33]Fax from Mark B. Lindsay, M.D. to the Nurses Station at the
Grimes County Jail dated Oct. 31, 2019, Docket Entry No. 27-4, pp.
24-26 (enclosing two handouts called "Ocular Prosthesis
Instructions" and "Caring for Your Prosthesis").

[34]Grimes County Jail Medical Chart dated Nov. 1, 2019, Docket
Entry No. 27-4, p. 27.   Dr. Adams explains that Lacri-Lube is not
an antibiotic, but is an eye lubricant used to treat "burning
irritation, and discomfort due to eye dryness."   Dr. Adams's
Affidavit, Docket Entry No. 27-1, p. 4, n. 8.

[35]Plaintiff's MDS, Docket Entry No. 8, p. 2.

-14-

that he had an artificial eye.[36]  He reported no other health issues
other than a history of drug use.[37]  The nurse who examined him (LVN
K. Anderson) described his appearance as clean and neat.[38]  On that
same day, Whitehead was given a different eye lubricant (Refresh
Tears) for thirty days as a substitute for the ointment he had
received at the Grimes County Jail.[39]

On November 6, 2019, Whitehead was screened for mental health
issues as part of the intake process.[40]  During that examination,
Whitehead stated that he felt "pretty good."[41]  Whitehead mentioned
that he had been treated for bi-polar disorder a few years earlier,
but was not on any medication or receiving any counseling.[42]  He
also mentioned losing his left eye following an accident in 2018.[43]
The provider who examined Whitehead observed that his appearance

---

[36]CMHC Intake History and Health Screening form, Docket Entry
No. 27-4, pp. 28, 31.

[37]Id. at 28-29.

[38]Id. at 29, 31.

[39]CMHC Intake Clinic Note dated Nov. 5, 2021, Docket Entry No.
27-4, p. 13; Prescription dated Nov. 5, 2021, Docket Entry No. 27-
4, p. 5.

[40]TDCJ Offender Intake Processing Psychological Screening
Interview, Docket Entry No. 27-4, p. 9.

[41]Id. at 10.

[42]Id.

[43]Id.

-15-

was "unremarkable."[44] Because of his history of treatment for bi-polar disorder, Whitehead was referred for further evaluation by a mental health provider.[45]

On November 8, 2019, Whitehead was seen by Dr. Zae Zeon, who conducted a thorough physical examination.[46] Whitehead's temperature was normal (97.7 degrees) and he voiced no complaints during the examination.[47] Whitehead's overall physical examination was also normal, but Dr. Zeon noted a "scanty discharge" from his left eye prosthesis.[48] The medical records show that Dr. Zeon prescribed a triple antibiotic ophthalmic ointment twice a day for ten days.[49]

On November 10, 2019, Whitehead was seen by a nurse (LVN Kathy McGuire), who administered a skin test for tuberculosis.[50] The test was negative.[51]

On November 14, 2019, the clinic received a Sick Call Request

---

[44]Id. at 12.

[45]Id.

[46]CMHC Intake Physical Exam, Docket Entry No. 27-4, pp. 6-8.

[47]Id. at 6.

[48]Id. at 6-7.

[49]Id. at 8; Prescription, Docket Entry No. 27-4, p. 4; Dr. Adams's Affidavit, Docket Entry No. 27-1, p. 5 (describing the prescription medication, which is abbreviated and not legible, as a "triple antibiotic ophthalmic ointment").

[50]Nursing Report: TB Skin Test, Docket Entry No. 27-4, p. 3.

[51]Id.

from Whitehead, who reported that his left eye implant was "very painful and bleeding periodically."[52]   That same day a registered nurse (RN K. Grimland) scheduled Whitehead to see a medical provider.[53]   Although Whitehead claims that he saw Blair on November 14, 2019, there is no record showing that he was seen by any medical provider on that date.[54]

On November 19, 2019, Whitehead was seen in the medical department in response to his Sick Call Request.[55]   During that appointment, Whitehead asked for medication to control his acid reflux.[56]   He also complained of "thick drainage" and "itching" from his left eye.[57]   Although Whitehead has alleged that he had a high fever and that his eye socket was so swollen that his implant was protruding,[58] the medical records of the examination do not support this claim.   The medical records show that Blair observed "scanty purulent drainage" coming from the "orbital space," but no edema

---

[52]TDCJ Health Services Division Sick Call Request, Docket Entry No. 27-5, p. 3.

[53]Id.

[54]TDCJ - Institutional Division Health Service System Individual History, Docket Entry No. 27-6, p. 3 (listing Whitehead's appointments by date).

[55]CMHC Clinic Notes dated Nov. 19, 2019, Docket Entry No. 27-6, p. 4.

[56]Id.

[57]Id.

[58]Plaintiff's MDS, Docket Entry No. 8, p. 13.

(swelling) along the eyelids or erythema (redness) along the "periorbital skin."[59] Blair checked Whitehead's vital signs and his temperature was normal (98 degrees).[60]  Blair prescribed an oral antibiotic (Clindamycin) 300 mg three times a day for ten days, Loratadine (Claritin) for 30 days, and an eye lubricant (Refresh Tears) twice a day for 30 days.[61] She placed an expedited referral to the UTMB Ophthalmology Clinic for further evaluation and she also scheduled a follow-up appointment with a unit medical provider within seven to ten days to check on his condition.[62] In addition, she prescribed Omeprazole (Priolosec) to treat Whitehead's acid reflux.[63]

On November 22, 2019, Whitehead was seen by a mental health provider for a full evaluation.[64]  The provider who conducted the evaluation noted no problems after examining Whitehead's ability to make eye contact, his facial expression, and his overall affect.[65]

_____

[59]CMHC Clinic Notes dated Nov. 19, 2019, Docket Entry No. 27-6, p. 4.

[60]Id.

[61]Id. at 5.

[62]Id.; see also Prescription, Docket Entry No. 27-6, pp. 7-8; CMHC Health Service Referral Request dated Nov. 19, 2019, Docket Entry No. 27-6, p. 9.

[63]Prescription, Docket Entry No. 27-6, p. 6.

[64]CMHC Mental Health Outpatient Services Mental Health Evaluation, Docket Entry No. 27-7, pp. 3-8.

[65]Id. at 7.

After assessing Whitehead's mental status, appearance, mood, and social functioning, the provider determined further that he had no mental health needs at that time.[66]

On November 26, 2019, Whitehead was escorted to the medical department at the Holliday Unit, where he complained of severe pain in his left eye.[67] Whitehead complained that the antibiotics were not working.[68] His temperature was normal (97.4 degrees), but a "moderate amount of thick purulent drainage" was observed from Whitehead's left eye.[69] Dr. Zeon approved Whitehead's transport to Huntsville Memorial Hospital ("HMH") in a unit van.[70]

Later that day on November 26, 2019, Whitehead was transferred to Memorial Hermann in Houston.[71]  While at Memorial Hermann, Whitehead reported for the first time that he had suffered "mild eye trauma with [an] elbow to the eye about two weeks ago."[72] He was "afebrile" with no "leukocytosis" noted in his blood work, which means that he was not running a fever and did not have an elevated

---

[66]Id. at 6-8.

[67]CMHC Urgent/Emergent Care Record dated Nov. 26, 2019, Docket Entry No. 27-8, p. 3.

[68]Id.

[69]Id.

[70]Id. at 7.

[71]Patient Discharge Instructions, Docket Entry No. 27-9, p. 7.

[72]Memorial Hermann Hospital Discharge Summary November 26-30, 2019, Docket Entry No. 27-9, p. 32.

white blood cell count that would indicate an infection.[73]  A CT
scan showed possible "orbital cellulitis," but a consulting
ophthalmologist determined that the findings were more consistent
with "pre-septal cellulitis" on examination.[74]

Dr. Adams explains that cellulitis is "an infection of skin
and/or other soft tissues."[75] "Preseptal or periorbital cellulitis
is infection of the skin and soft tissues surrounding the orbit
(eye socket)."[76] "Orbital [c]ellulitis is infection of soft tissues
within the orbit – i.e. posterior to the orbital septum."[77]  Dr.
Adams explains further that "[t]he orbit or eye socket is the bony
cup that holds the eyeball or in Mr. Whitehead's case his eye
implant and prosthesis."[78]

Doctors at Memorial Hermann treated Whitehead with intravenous
antibiotics, including Vancomycin, Rocephin, and Flagyl, for

---

[73]Id.; see also Dr. Adams's Affidavit, Docket Entry No. 27-1, p. 7 & n. 22.

[74]Memorial Hermann Hospital Discharge Summary November 26-30, 2019, Docket Entry No. 27-9, p. 32.

[75]Dr. Adams's Affidavit, Docket Entry No. 27-1, p. 3, n. 3 (citing an article attached as Exhibit [A-2], Preseptal and Orbital Cellulitis, by Dr. James Garrity of the Mayo Clinic, Docket Entry No. 27-3, pp. 1-3)

[76]Id.

[77]Id.

[78]Id.

several days.[79]   On November 29, 2019, Whitehead's left eye prosthesis was surgically removed and replaced with a "dermis fat graft" from his abdomen.[80]   On November 30, 2019, Whitehead was cleared for discharge with instructions to follow up with an ophthalmology appointment "through [the] prison system or UTMB" within one week.[81]

Upon Whitehead's return to the Holliday Unit on November 30, 2019, he was evaluated by a registered nurse (Daniel Maloney) who reviewed the discharge plan from Memorial Hermann.[82]   The nurse contacted a physician (Dr. James Geddes), who prescribed Tylenol with codeine for pain and an ophthalmic ointment.[83]   Whitehead was also given a pass to return to the medical department for a follow-up appointment on December 2, 2019.[84]

On December 2, 2019, Whitehead returned to the clinic and was treated by Dr. Zeon, who prescribed a triple antibiotic ointment for ten days and scheduled a follow-up appointment with the

_____

[79]Memorial Hermann Hospital Discharge Summary November 26-30, 2019, Docket Entry No. 27-9, p. 32.

[80]Id.

[81]Id. at 34 (recommending a follow-up appointment with an ophthalmologist at Memorial Hermann or through the prison system if Whitehead was unable to make that appointment).

[82]CMHC Hospital/ER Discharge Assessment dated Nov. 30, 2019, Docket Entry No. 27-10, pp. 4-6.

[83]Id. at 5-6.

[84]CMHC Return to Clinic Pass, Docket Entry No. 27-10, p. 3.

ophthalmology specialty clinic at the UTMB Hospital in Galveston.[85] Whitehead received daily wound care with dressing changes and did not voice any complaints during the ten-day time period.[86] On December 12, 2022, Whitehead's sutures were removed.[87]

Whitehead was seen in the UTMB Ophthalmology Clinic on December 16, 2019.[88] The ophthalmologist who treated Whitehead recommended that he return to the UTMB Hospital for a visit to the "plastics clinic for evaluation of additional surgery for orbital implant placement [versus] continued monitoring with fat pad graft."[89] At a follow-up appointment on January 3, 2020, the ophthalmologist who treated Whitehead noted that he was doing well and had no further pain or discharge.[90] He prescribed monitoring for six months to ensure a "stable graft" and referred Whitehead for an appointment with an ocularist at the Estelle Unit for an

---

[85]CMHC Clinic Notes dated Dec. 2, 2019, Docket Entry No. 27-11, p. 4.

[86]Nursing Dressing/Wound Care, December 1-11, 2019, Docket Entry No. 27-12, pp. 4-11.

[87]Nursing Suture/Staple Removal Visit, Docket Entry No. 27-12, p. 3.

[88]TDCJ Clinic Department of Ophthalmology Initial Encounter Note, Docket Entry No. 27-13, pp. 3-8.

[89]Id. at 5.

[90]TDCJ Clinic Department of Ophthalmology Initial Encounter Note, Docket Entry No. 27-13, p. 17.

orbital prosthesis.[91]  Dr. Adams explains that this appointment was delayed after Whitehead left TDCJ custody on a bench warrant between February 19, 2020, through March 17, 2020.[92] Because the COVID-19 pandemic restricted prisoner movement in non-emergency situations until late 2020, Whitehead was not seen by an ocularist until January 13, 2021.[93]  Whitehead received a prosthesis on March 10, 2021, but was scheduled to return in two months to receive another one that was "less red" and "bigger to accommodate."[94]

### 2.  Claims Against Melody Curbo

Whitehead alleges that he saw Curbo during the intake process on November 7, 2019, and that she denied his request for immediate care for fever and severe pain in his left eye, which was "leaking blood and puss."[95] The medical records do not support Whitehead's claim that he was refused care by Curbo or that he required immediate medical treatment for his left eye on November 7, 2019.

Although Whitehead appears to claim that he saw Curbo during the initial intake process, there is no record showing that he was evaluated by anyone other than Nurse Anderson when he arrived at

---

[91]Id.

[92]Dr. Adams's Affidavit, Docket Entry No. 27-1, p. 8.

[93]Id.; CMHC Ocular Prosthesis Record, Docket Entry No. 27-14, p. 4.

[94]CMHC Ocular Prosthesis Record, Docket Entry No. 27-14, p. 3.

[95]Plaintiff's MDS, Docket Entry No. 8, p. 6.

the Holliday Unit on November 5, 2019.[96]   Whitehead reported no
health issues during that encounter and Nurse Anderson did not
observe any.[97]   Whitehead had mental health screening the following
day on November 6, 2019, where he told the provider that he felt
"pretty good."[98]   Dr. Zeon conducted a thorough physical examination
two days later on November 8, 2019, where he observed "scanty"
discharge from Whitehead's left eye, but there is no record showing
that Whitehead had a fever or that he complained of any pain.[99]

There is no medical record showing that Whitehead was seen by
any health care provider on November 7, 2019, or that he required
treatment on that date.   More importantly, there is no record
showing that Curbo had any involvement with Whitehead's medical
care during the entire month of November.   Personal involvement is
an essential element of a civil rights cause of action in an
individual capacity claim.   See Murphy v. Kellar, 950 F.2d 290, 292
(5th Cir. 1992).   Absent a showing that Curbo had any involvement
in the intake process or his medical care, Whitehead fails to show
that she denied him adequate care in violation of the Eighth
Amendment and he does not overcome her entitlement to qualified

---

[96]CMHC Intake History and Health Screening form, Docket Entry
No. 27-4, pp. 27-31.

[97]Id.

[98]TDCJ Offender Intake Processing Psychological Screening
Interview, Docket Entry No. 27-4, p. 10.

[99]CMHC Intake Physical Exam, Docket Entry No. 27-4, pp. 6-8.

immunity. The defendants' motion for summary judgment on this issue is granted.

### 3. **Claims Against Latina Blair**

Whitehead alleges that Blair denied his requests for care on November 14 and November 19, 2019, when he reportedly had a high fever and his eye socket was so swollen that his implant was protruding.[100] As noted above, there is no record showing that he was seen by any medical provider on November 14, 2014, which is the date that Whitehead submitted a Sick Call Request for care.[101] The medical records reflect that Whitehead saw Blair on November 19, 2019, in response to a Sick Call Request that he submitted on November 14, 2019.[102] However, the medical records of that examination show that he did not have a fever and that Blair observed no redness or swelling around his left eye.[103] Because Blair noticed a "scanty purulent drainage" coming from his left eye, she prescribed an oral antibiotic and other medication.[104] She placed an expedited referral to the UTMB Ophthalmology Clinic for

---

[100]Plaintiff's MDS, Docket Entry No. 8, p. 13.

[101]TDCJ - Institutional Division Health Service System Individual History, Docket Entry No. 27-6, p. 3; TDCJ Health Services Division Sick Call Request, Docket Entry No. 27-5, p. 3.

[102]CMHC Clinic Notes dated Nov. 19, 2019, Docket Entry No. 27-6, p. 4.

[103]CMHC Clinic Notes dated Nov. 19, 2019, Docket Entry No. 27-6, p. 4.

[104]Id. at 5.

further evaluation and she also scheduled a follow-up appointment with a unit medical provider to check his condition.[105]   According to Dr. Adams, Blair responded properly and Whitehead was not denied appropriate medical care during November 2019.[106]

The Supreme Court has recognized that whether a particular form of treatment is indicated "is a classic example of a matter for medical judgment." Estelle, 97 S. Ct. at 293.   Unsuccessful medical care does not demonstrate deliberate indifference or a violation of the Eighth Amendment.   See Gobert, 463 F.3d at 346. Even if a lapse in professional judgment occurred, any such failure would amount to no more than mere negligence or malpractice, and not a constitutional violation.   See Harris v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999) (citing Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993)).   Whitehead does not demonstrate that Blair refused to provide him with medical care or that she intentionally treated him incorrectly.   To the extent that Whitehead disagrees with the level of care that he received, a prisoner's disagreement with a health care provider's assessment is insufficient to establish deliberate indifference.   See Gobert, 463 F.3d at 346; see also Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).   Because

_____

[105]Id.; see also Prescription, Docket Entry No. 27-6, pp. 7-8; CMHC Health Service Referral Request dated Nov. 19, 2019, Docket Entry No. 27-6, p. 9.

[106]Dr. Adams's Affidavit, Docket Entry No. 27-1, pp. 9, 10.

Whitehead does not establish that he was denied care with deliberate indifference in violation of the Eighth Amendment, Blair is entitled to qualified immunity and summary judgment in her favor.  Absent a valid claim, Whitehead's action will be dismissed.

### IV.   Conclusion and Order

Based on the foregoing, the court **ORDERS** as follows:

1.   Defendants LaTina Blair and Melody Curbo's Motion for Summary Judgment (Docket Entry No. 27) is **GRANTED.**

2.   This civil action will be **DISMISSED with prejudice.**

The Clerk is directed to provide a copy of this Memorandum Opinion and Order to the parties.

**SIGNED** at Houston, Texas, on this the 1st day of February, 2022.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE